Phipps Industrial Land Trust v. Commissioner.
Phipps Industrial Land Trust v. Commissioner
Docket No. 2277-62.
United States Tax Court
T.C. Memo 1963-329; 1963 Tax Ct. Memo LEXIS 16; 22 T.C.M. (CCH) 1724; T.C.M. (RIA) 63329; December 19, 1963
*16 Delman H. Eure and Irving H. Bull, 161 E. 42nd St., New York, N. Y., for the petitioner. Charles M. Greenspan, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioner for its taxable year 1957 has been determined by respondent in the amount of $13,105.48. The sole issue presented by the pleadings is the amount of capital gain realized by petitioner in 1953 upon its sale of real property. Disposition of this issue will be determinative of the amount of petitioner's net operating loss and net long-term capital gain for 1957. Findings of Fact The facts which have been stipulated are found as fact. The petitioner, Phipps Industrial Land Trust, is a trust which is taxable as a corporation. It was formed pursuant to a trust agreement dated December 31, 1920. It is owned entirely by Bessemer Securities Corporation, which is "a personal holding company which has subsidiaries involved in different kinds of operations, and also a list of stock and bonds of a general nature." Bessemer Securities Corporation and petitioner were founded by the Henry Phipps family. During 1953 the petitioner was engaged *17 in the management of its own real estate investments, chiefly in the area of Chicago, Illinois. The petitioner filed Federal corporate income tax returns for the taxable year 1957 and for the year 1953 with the district director of internal revenue at Chicago, Illinois. In its 1953 Federal income tax return, petitioner reported long-term capital gain from the sale of certain real estate as follows: DEFERRED PAYMENT SALE
Dilworth Property - Kenwood Mfg. District
PURCHASER - Flynn Brothers
DATE: September 15, 1953
Selling Price
$45,000.00
Cost
3,960.79
Gross Profit
$41,039.21
Less Selling Expenses
Commission
$4,500
4,500.00
Net Profit
$36,539.21
TREATMENT AS DEFERRED PAY-
MENT SALE
Portion of Selling Price Paid in 1953
$15,000.00
Less Cost
3,960.79
$11,039.21
Less Selling Expenses
Commission
$4,500
Legal Expense
500
5,000.00
Gain on Down Payment - 1953
$6,039.21
GAIN ON MONTHLY PAYMENTS - 1953
Total
Pay-
Inter-
ment
est
Profit
10-15-53 $255
$150.00
$105.00
$ 105.00
11-15-53
255
159.44
95.56
95.56
12-15-53
255
134.09
120.91
120.91
$6,360.68
*18 The Dilworth Property had been acquired by the petitioner on January 1, 1921. On September 15, 1953, the adjusted basis of this real estate for Federal income tax purposes was $3,960.79. The Dilworth Property, the real property in question, was located due west of the Loop District in the city of Chicago, Illinois. The petitioner had leased the property to a man named Dilworth who had erected a filling station thereon in 1931. In 1946 the lease was assigned by Dilworth to the Flynn brothers, John B. and Thomas F. Flynn. The Flynn brothers attempted to purchase the property from petitioner when they became lessees, but at that time the petitioner did not wish to sell. On February 10, 1950, the petitioner granted the Flynns a new lease expiring September 30, 1961. The terms of the lease required the Flynns to maintain the property, pay all taxes, carry insurance, etc. The petitioner never offered the property for sale to the public, nor was it ever advertised for sale. Subsequently, the Flynns again indicated to petitioner that they wished to purchase the property. In reply the petitioner initially set a selling price of $50,000. On September 15, 1953, the petitioner and the Flynn *19 brothers executed a land contract covering the real property in question. The purchase price was $45,000. The contract also stated that $15,000 was to be paid upon execution thereof and the balance in monthly installments of $255 with a privilege to prepay on account of principal in any multiple of $1,000. The petitioner was also to be paid interest at the rate of 6 percent on the unpaid balance. As under the former lease, the purchasers undertook to pay taxes, insurance, repairs and maintenance, etc. The purchasers were forbidden to sell, mortgage, pledge, or assign the contract without the consent of the petitioner. The land contract provided that the Flynn brothers were personally liable for the full purchase price in the event of default. Article XV of the land contract provided as follows: Sale by Vendors. The vendors may at any time sell the real estate hereinbefore described subject to this Contract and upon any such sale being made, the vendors (and their successor's as Trustees under the Trust Agreement of the Phipps Industrial Land Trust) shall be relieved and released from any further liability, but each successive purchaser shall be deemed to have assumed the obligations *20 of the vendors under this Contract so long as he (it, she or they) shall own the real estate hereinbefore described. Ultimate Findings The contract of sale under which the Dilworth property was sold was a common method, used in Chicago, Illinois, during 1953, for the sale of real property. A market existed in that area at that time for the purchase and sale of the vendors' interests in such contracts. The fair market value of the land contract at issue upon its execution in 1953 and after payment to petitioner of the down payment called for therein was $24,000. Opinion Petitioner here contends it was under no obligation to report as gain in 1953 as property other than money received by it any portion of the fair market value of the contract of sale used in its sale of the Dilworth property to the Flynn brothers in that year. Its reason for so contending is premised upon the claimed fact that the contract (a) is not the type of asset which may be characterized as the equivalent of cash and (b) that, whatever its character, it had no ascertainable fair market value in 1953, the year of its execution, due to the fact that there was no market for such contracts at that time *21 in the Chicago area. Respondent contends, however, that such a market existed, that the contract had a fair market value equal to the unpaid balance thereof after payment of the down payment mentioned and acknowledged therein, and has computed the deficiency herein on that premise. Petitioner seeks a net operating loss carryover deduction for the taxable year 1957. The Commissioner has disallowed such deduction. The burden of proof therefore rests upon petitioner to provide sufficient evidence upon which its claimed deduction may be upheld. It has failed to provide such evidence. Such evidence as does exist tends instead to support the respondent's determination of a deficiency. Petitioner's reliance herein is placed upon . Because of the findings of ultimate fact herein, this case is distinguishable from In that case no finding is made relative to the existence of a market for the purchase or sale of the land contract there at issue. In the absence of such a fact the Court's finding that the land contract was not the equivalent of cash is understandable. Here we have evidence through advertising media current in *22 1953 in the Chicago area that many financial institutions dealt generally in real estate securities and some of them offered specifically to purchase or sell contracts of sale. An individual who dealt in such land contracts in 1953 subsequently testified in this case. His testimony is the only affirmative oral testimony concerning the existence of a market for land contracts which was provided by either party. We think additional oral testimony was available to either party. We assume petitioner's failure to produce such testimony was because of the fact that, if produced, it would have redounded to its disadvantage. The witness who did testify, although interviewed by both parties prior to trial, was called by respondent, not by petitioner. This witness, through his testimony, established the fact that not only he, but others dealt in land contracts in Chicago in 1953. His testimony to this effect coupled with the above-mentioned evidence provided by local advertising media satisfies us that a market for land contracts such as the one here involved did exist in the Chicago area in 1953. See Howard H. Perelman, 41 T.C. - (Nov. 20, 1963). Respondent, in his deficiency notice, treated *23 the entire unpaid balance of the Dilworth property contract as property other than money received by petitioner in 1953 upon sale of that property. The only evidence adduced with respect to the fair market value of the land contract in question was that provided by respondent's own witness mentioned above. His testimony clearly indicates that, in his opinion, the unpaid balance of the contract must be discounted at least 20 percent in order to arrive at its fair market value. Because this evidence is the only such evidence available to us, we hold in accordance therewith and have determined the fair market value of the contract in our ultimate findings. We therefore hold that petitioner's net operating loss carryover deduction at issue herein was properly disallowed to the extent of only 80 percent thereof. Decision will be entered under Rule 50.